ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

In re NYSE SPECIALISTS SECURITIES
LITIGATION

------------------------------------X

U. S. DISTRICT COURT
FILED
JUN 05 2009
S.D. OF N. Y.

03 Civ. 8264 (RWS)

OPINION

FILED UNDER SEAL

A P P E A R A N C E S :

_ 07624

Attorneys for Plaintiff

COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
By:   Mark Solomon, Esq.
      Byron S. Georgiou, Esq.
      David W. Mitchell, Esq.
      Alexandra S. Bernay, Esq.
      Eric I. Niehaus, Esq.
      Suzanne H. Stevens, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-17-09

Attorneys for Defendants

MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY  10178
By:   John M. Vassos, Esq.
      Rachelle M. Barstow, Esq.

DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, NY  10017
By:   George A. Sirignano, III, Esq.
      Ian R. Rooney, Esq.
      James I. McClammy, Esq.
      Lawrence J. Portnoy, Esq.

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
By:   Irwin H. Warren, Esq.
      Joanna R. Varon, Esq.

MICROFILMED
JUN 1 5 2009 -12

Stephen A. Radin, Esq.

KATTEN MUCHIN ZAVIS ROSENMAN
575 Madison Avenue
New York, NY 10022
By:  Steven E. Schiffman, Esq.

DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP
2101 L Street, N.W.
Washington, D.C. 20037
By:  Howard Schiffman, Esq.

WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
By:  Anne K. Small, Esq.
     Robert B. McCaw, Esq.
     Robert W. Trenchard, Esq.
     Wendy A. Harris, Esq.

KING & SPAULDING LLP
1185 Avenue of the Americas
New York, NY 10036
By:  Deborah S. Burstein, Esq.
     Richard A. Cirillo, Esq.

WOLF, BLOCK, SCHORR & SOLIS-COHEN LLP
1650 Arch Street, 22nd Floor
Philadelphia, PA 19103
By:  Andrew C. Curley, Esq.
     Brian J. Slipakoff, Esq.
     M. Norman Goldberger, Esq.
     Nathan E. Kase, Esq.

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
By:  Robert J. Giuffra, Jr., Esq.

**Sweet, D.J.,**

Lead Plaintiff, California Public Employees'
Retirement System ("CalPERS" or "Lead Plaintiff") has
moved, pursuant to Rule 23, Fed. R. Civ. P., for an order
certifying this consolidated action as a class action and
naming CalPERS and Market Street Securities, Inc. ("Market
Street") representatives of the class.

Defendant Specialist Firms[1] have moved to strike
the Report of Shane A. Corwin, Ph.D. ("Corwin Report"), and
the Report of Matthew Curtin, CISSP, in Support of Lead
Plaintiff's Motion for Class Certification ("Curtin
Report").

Lead Plaintiff has also submitted a motion to
Strike Improperly Submitted Legal Argument in Defendants'

---

[1] For the purposes of this opinion, LaBranche & Co., LLC ("LaBranche
LLC"); LaBranche & Co., Inc. ("LaBranche Inc."); Spear, Leeds & Kellogg
Specialists LLC ("Spear Leeds LLC"); Spear, Leeds & Kellogg, L.P.
("Spear Leeds LP"); Van der Moolen Specialists USA, LLC ("VDM
Specialists"); Van der Moolen Holding, N.V. ("VDM Holding"); Fleet
Specialist, Inc. ("Fleet Specialist"); FleetBoston Financial Corp.
("FleetBoston Corp."); Bear Wagner Specialists LLC ("Bear Wagner LLC");
Bear Stearns & Co., Inc. ("Bear Stearns"); SIG Specialists, Inc. ("SIG
Specialists"); Susquehanna International Group, LLP ("Susquehanna");
Performance Specialist Group, LLC ("Performance Specialist"); George
M.L. LaBranche, IV; ("M. LaBranche"); Goldman, Sachs & Co. ("Goldman
Sachs"); The Goldman Sachs Group, Inc. ("Goldman Sachs Group"); Bank of
America Corp. ("Bank of America"); and Quick & Reilly, Inc. ("Quick &
Reilly"), are referred to collectively as the "Specialist Firms."

1

Appendix to the Specialist Firms' Memorandum of Law in
Opposition to Lead Plaintiff's Motion for Class
Certification.

For the reasons set forth below, Lead Plaintiff's
motion for class certification is granted, and CalPERS and
Market Street are appointed class representatives. The
Specialist Firms' motion to strike the Corwin and Curtin
Reports is denied, as is CalPERS' motion to strike.

## I. PRIOR PROCEEDINGS

This is a consolidated securities fraud action
brought on behalf of a purported class of investors against
defendants, specialist firms on the New York Stock Exchange
("NYSE") and the NYSE (collectively, "Defendants"),
alleging violations of the federal securities laws. The
action was commenced on October 17, 2003, with the filing
of a complaint by Pirelli Armstrong Tire Corporation
Retiree Medical Benefits Trust on behalf of itself and all
others similarly situated (03 Civ. 8264). Additional
complaints were subsequently filed by Lawrence Marcus on
October 27, 2003 (03 Civ. 8521), Empire Programs, Inc.
("Empire NJ") on November 11, 2003 (03 Civ. 8935), and

CalPERS on December 16, 2003 (03 Civ. 9968).  On March 16,
2004, Rosenbaum Partners, LP filed a complaint in its
individual capacity (04 Civ. 2038).

By an opinion dated May 27, 2004, the above-
referenced actions were consolidated for all purposes under
Docket Number 03 Civ. 8264.  See Pirelli Armstrong Tire
Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.,
229 F.R.D. 395, 401-02 (S.D.N.Y. 2004) ("Pirelli").  CalPERS
and Empire NJ were appointed co-lead plaintiffs, and lead
counsel was selected.  Id. at 402-21.  A consolidated
complaint (the "Complaint") was filed on September 17,
2004.

On November 16, 2004, the Specialist Firms moved
to dismiss the Complaint pursuant to Rules 9(b) and
12(b)(6), Fed. R. Civ. P.  On November 17, 2004, the NYSE
moved to dismiss the Complaint, also pursuant to Rule
12(b)(6), Fed. R. Civ. P.   In an opinion dated December
13, 2005, the Complaint was dismissed with prejudice in its
entirety as to the NYSE.  In re NYSE Specialists Sec.
Litig., 405 F. Supp. 2d 281, 302-06 (S.D.N.Y. 2005) (the
"December 2005 Opinion").  The December 2005 Opinion also
dismissed the state law claims against all Defendants, the

3

Section 20(a) claim as to Susquehanna, and the Section 10(b) manipulative scheme claim as to Spear Leeds LP, Goldman Sachs, the Goldman Sachs Group, FleetBoston Corp., Bank of America, Quick & Reilly, Bear Stearns, SIG LLP, and Susquehanna. Id. at 306-20. While denying the Specialist Firms' motion to dismiss the remaining claims, the Court held that no customer could recover with respect to trades already covered by the Specialist Firms' regulatory settlements. Id. at 310-11. Finally, the Court denied as moot a motion filed on October 1, 2004, by CalPERS and Empire NJ, and marked as fully submitted on November 17, 2004, to modify the Private Securities Litigation Reform Act ("PSLRA") discovery stay. Id. at 320-21.

On January 12, 2006, CalPERS and Empire NJ moved for an order granting certification and entry of final judgment based on the Court's final determination of the claims against the NYSE. A clerk's judgment was entered on February 17, 2006. CalPERS and Empire NJ appealed, and on September 18, 2007, the Court of Appeals affirmed the judgment as to the NYSE's absolute immunity, but vacated and remanded this Court's ruling that CalPERS and Empire NJ lacked standing under Rule 10b-5 to pursue their

4

misrepresentation claims against the NYSE. In re NYSE
Specialists Sec. Litig., 503 F.3d 89 (2d Cir. 2007).

An order was signed on January 24, 2006,
permitting CalPERS and Empire NJ to file an amended
complaint adding Martin as party plaintiff. The Amended
Consolidated Complaint (the "Amended Complaint") was filed
on February 2, 2006.

On March 3, 2006, purported plaintiff class
member Sea Carriers Corporation ("Sea Carriers") filed a
motion for an order to: (1) "decertify" Empire NJ as co-
lead plaintiff; (2) add Sea Carriers as a named plaintiff
and "certify" Sea Carriers to replace Empire NJ as co-lead
plaintiff; and (3) approve Sea Carriers' election of Becker
Meisel as co-lead plaintiff's counsel. This motion was
heard and marked fully submitted on April 26, 2006. On
August 14, 2006, Martin similarly moved for an order
appointing him as co-lead plaintiff to any extent that
Empire NJ does not continue as co-lead plaintiff. This
motion was heard and marked fully submitted on October 4,
2006. On February 26, 2007, the Court issued an opinion
granting Sea Carriers' motion to disqualify and remove
Empire NJ as co-lead plaintiff, and denying its motion to

replace Empire NJ as co-lead plaintiff. In re NYSE Specialists Sec. Litig., 240 F.R.D. 128, 139 (S.D.N.Y. 2007). The Court also denied Martin's motion to be appointed co-lead plaintiff in place of Empire NJ. Id. at 143—45.

On December 11, 2006, Sea Carriers and its president filed motions to quash subpoenas served upon them by the Specialist Firms. The motion was marked fully submitted on January 25, 2007, and granted by the Court on July 5, 2007.

Lead Plaintiff filed the instant motion for class certification on June 28, 2007. CalPERS filed its motion to Strike Improperly Submitted Legal Arguments on December 13, 2007. The Specialist Firms filed their motion to strike the Corwin and Curtin Reports on January 25, 2008. Oral argument was heard on the motions on April 30, 2008.

**II. THE FACTS**

The parties' familiarity with the facts is assumed. In brief, trades in stocks for the 2,800 listed companies on the NYSE are handled by one of the seven

6

Specialist Firms. While only one specialist can be
designated for a given stock listed in the NYSE, a given
Specialist Firm may handle more than one stock.

All trading on the NYSE is conducted through an
auction process, facilitated by individual specialists in
one of two ways. First, orders can be conveyed orally and
in-person to the specialist handling trades in that
company's stock by a floor broker on the floor of the NYSE.
Alternatively, orders can be transmitted to the specialist
through the NYSE's electronic order entry system, known as
the Super Designated Order Turnaround System ("SuperDOT").
Electronic orders appear on an electronic workstation
referred to as a "Display Book." Once an order is
received, the specialist has three choices. He can execute
the order against another order in the Display Book,
against an order represented by a floor broker, or against
his own inventory.

Specialists are responsible for maintaining a
two-sided auction market by providing an opportunity for
public orders to be executed against each other. In order
to do so, they serve dual roles, acting as both "agent" and
"principal." Once an order has been received, the

7

specialist, acting as agent, is required to match the open
order to buy with an open order to sell within the same
price range. Specialists generally receive no compensation
for filling orders as agents.

When there are no matching orders to sell and
orders to buy, specialists are permitted to trade on a
"principal" basis by either selling the stock from their
own proprietary account to fulfill the investor's order to
buy or buying the stock and holding it in their own account
to fill an investor's order to sell.

## THE NYSE Rules

The NYSE has several rules in place governing
specialists' conduct. NYSE Rule 104 places a negative
obligation on specialists, prohibiting "purchases or sales
of any security in which such specialist is registered . .
. unless such dealings are reasonably necessary to permit
such specialist to maintain a fair and orderly market."

NYSE Rule 92 prohibits proprietary trading, with
limited exceptions, when the specialist "has knowledge of

8

any particular unexecuted customer's order to buy (sell) such security which could be executed at the same price."

The NYSE also has in place certain mechanisms to implement the so-called "priority rules." For example, when the Display Book is used to execute a trade, as opposed to trades executed orally on the NYSE floor, the Display Book automatically places executable public orders on the buy and sell sides of the trade. See SEC Office of Compliance Inspections and Examinations Report ("OCIE Rep.") at 14, Pl. Ex. 16. When a specialist attempts to trade ahead of a customer order, the Display Book highlights the customer order to alert the specialist of a potential violation. Id. To execute a trade ahead of a public customer order, the specialist is required to enter extra keystrokes. Id. In short, "NYSE trading systems are designed to prevent specialists from accidentally violating the Priority Rule." OCIE Rep. at 3.

## The SEC Investigation

On March 30, 2004, and July 26, 2004, the Securities Exchange Commission ("SEC") announced that it had instituted administrative and cease-and-desist

9

proceedings against the seven Specialist Firms, and that
each of the firms had reached a settlement agreement with
the SEC and NYSE providing for the payment of more than
$240 million in penalties and disgorgement.  The
allegations with respect to each of the Specialist Firms
are briefly summarized below.

1.    **LaBranche LLC**

The SEC and NYSE determined that between January
1999 and 2003, LaBranche LLC engaged in interpositioning,
resulting in customer disadvantage of $8,689,574, trading
ahead, resulting in customer disadvantage of $30,969,236,
and non-execution of limit orders, resulting in customer
disadvantage of $1,987,630.  The total customer
disadvantage was determined to be $41,646,440.  It was
further determined that the interpositioning violations
with respect to certain transactions were done by certain
LaBranche LLC specialists with scienter, and that certain
senior executives at LaBranche LLC knew about the illicit
trading.

Based on the SEC and NYSE determinations, which
were neither admitted nor denied, LaBranche LLC agreed to

10

pay $41,646,440 in disgorgement and $21,872,320 in civil penalties. See December 2005 Opinion, at 292—93.

## 2. Spear Leeds LLC

The SEC and NYSE determined that from January 1999 through 2003, Spear Leeds LLC engaged in interpositioning, trading ahead and intentional non-execution of limit orders and that such practices resulted in customer disadvantage of $28,776,072. Of this total, $8,309,962 of customer disadvantage was the result of interpositioning, $19,430,004 was the result of trading ahead, and $1,036,106 was the result of non-execution of limit orders. It was determined that the interpositioning violations with respect to certain transactions were done by certain Spear Leeds LLC specialists with scienter, and that certain Spear Leeds LLC senior executives knew about the illicit trading.

Based on these determinations, which were neither admitted nor denied, Spear Leeds LLC paid $28,776,072 in disgorgement and $16,496,406 in civil penalties. Id. at 293—94.

11

### 3.     VDM Specialists

The SEC and NYSE determined that from January
1999 through 2003, VDM Specialists engaged in
interpositioning, resulting in $14,629,743 of customer
disadvantage, trading ahead, resulting in $19,209,087 of
customer disadvantage, and intentional non-execution of
limit orders, resulting in $1,087,783 in customer
disadvantage, and that such conduct resulted in a total of
$34,926,613 of customer disadvantage. It was determined
that the interpositioning in certain stocks was done with
scienter and that certain members of VDM Specialists'
management committee engaged in interpositioning in certain
stocks.

Based on these determinations, which were neither
admitted nor denied, VDM Specialists agreed to pay
$34,926,613 in disgorgement and $22,748,491 in civil
penalties. Id. at 294.

### 4.     Fleet Specialist

The SEC and NYSE determined that from January
1999 through 2003, Fleet Specialist engaged in

12

interpositioning, trading ahead and intentional non-execution of limit orders, and that such practices resulted in $38,013,594 of customer disadvantage. Of this total, $9,797,398 of customer disadvantage was caused by interpositioning, $26,969,830 was caused by trading ahead, and $1,246,366 was caused by non-execution of limit orders. It was determined that certain interpositioning transactions were done with scienter.

Based on these determinations, which were neither admitted nor denied, Fleet Specialist agreed to pay $38,013,594 in disgorgement and $21,083,875 in civil penalties. Id. at 294—95.

## 5. **Bear Wagner LLC**

The SEC and NYSE determined that from January 1999 through 2003, Bear Wagner LLC engaged in interpositioning, trading ahead and intentional non-execution of limit orders and that such conduct resulted in $10,724,903 of customer disadvantage. Of this total, $2,074,303 was caused by interpositioning, $8,085,348 was caused by trading ahead, and $565,252 was caused by non-

13

execution of limit orders. It was determined that certain
interpositioning transactions were done with scienter.

Based on these determinations, which were neither
admitted nor denied, Bear Wagner LLC agreed to pay
$10,724,903 in disgorgement and $5,534,543 in civil
penalties. Id. at 295.

## 6. SIG Specialists

The SEC and NYSE determined that from January
1999 and 2003, SIG Specialists engaged in interpositioning,
resulting in $282,983 of customer disadvantage, trading
ahead, resulting in $1,684,525 of customer disadvantage,
and non-execution of limit orders, resulting in $78,063 in
customer disadvantage, and that such conduct resulted in a
total of $2,045,571 of customer disadvantage. It was
determined that certain interpositioning transactions were
done with scienter.

Based on these determinations, which were neither
admitted nor denied, SIG Specialists agreed to pay
$2,045,571 in disgorgement and $988,018 in civil penalties.
Id.

14

## 7. **Performance Specialist**

The SEC and NYSE determined that from January
1999 through 2003, Performance Specialist engaged in
interpositioning, trading ahead and non-execution of limit
orders that resulted in $1,491,171 of customer
disadvantage. Of this total, $140,488 of customer
disadvantage was caused by interpositioning, $1,283,098 was
caused by trading ahead, and $67,585 was caused by non-
execution of limit orders. It was determined that certain
interpositioning transactions were done with scienter.

Based on these determinations, which were neither
admitted nor denied, Performance Specialists agreed to pay
$1,491,171 in disgorgement and $680,761 in civil penalties.
Id. at 295-96.

### The Government Trials

In April 2005, a grand jury in this district
handed down indictments against fifteen current and former
individual specialists at the NYSE alleging violations of
15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.

15

Indictments against five individual specialists proceeded to trial. VDM Specialists' Michael Hayward and Michael Stern, and Fleet Specialist's David Finnerty, were convicted of violating 15 U.S.C. § 78j and 78ff and 17 C.F.R. § 240.10b-5. See United States v. Hayward, No. 05 Cr. 390-03 (SAS) (S.D.N.Y. July 14, 2006); United States v. Stern, No. 05 Cr. 390-04 (SAS) (S.D.N.Y. July 14, 2006); United States v. Finnerty, 474 F. Supp. 2d 530, 536 (S.D.N.Y. 2007), aff'd 533 F.3d 143 (2d Cir. 2008). The district court later granted Finnerty's post-trial motion for a judgment of acquittal based on the government's failure to prove that "interpositing constituted a deceptive act within the meaning of the federal securities laws because it did not provide proof of customer expectations." Finnerty, 474 F. Supp. 2d at 542. The convictions of Hayward and Stern were reversed on the same grounds by the Court of Appeals. See United States v. Hayward, 284 F. App'x 857 (2d Cir. 2008).

VDM Specialists' Richard Volpe and Robert Scavone were acquitted. See United States v. Volpe, No. 05 Cr. 390-05 (SAS) (S.D.N.Y. Sept. 18, 2006); United States v. Scavone, No. 05 Cr. 390-06 (SAS) (S.D.N.Y. Aug. 2, 2006).

Two specialists, VDM Specialists' Joseph
Bongiorno and Patrick McGagh, plead guilty to criminal
securities fraud. See United States v. Bongiorno, No. 05
Cr. 390-01 (SHS) (S.D.N.Y. Oct. 13, 2006); United States v.
McGagh, No. 05 Cr. 390-02 (SHS) (S.D.N.Y. Oct. 13, 2006).
In light of the Court of Appeals' decisions in Finnerty and
Hayward, the convictions of both Bongiorno and McGagh were
later vacated. See Bongiorno, No. 05 Cr. 390-01 (SHS)
(S.D.N.Y. Aug. 25, 2008); McGagh, No. 05 Cr. 390-02 (SHS)
(S.D.N.Y. Aug. 25, 2008).

Orders of nolle prosequi were filed with respect
to the remaining individual specialist defendants. See
United States v. Deboer, No. 05 Cr. 396 (DLC) (S.D.N.Y.
Aug. 25, 2008); United States v. Hayes, No. 05 Cr. 390-07
(SAS) (S.D.N.Y. Nov. 22, 2006); United States v. Johnson,
No. 05 Cr. 392 (NRB) (S.D.N.Y. Nov. 21, 2006); United
States v. Delaney, No. 05 Cr. 394 (HB) (S.D.N.Y. Nov. 21,
2006); United States v. Hunt, No. 05 Cr. 395 (DAB)
(S.D.N.Y. Nov. 21, 2006); United States v. Murphy, No. 05
Cr. 397 (DC) (S.D.N.Y. Nov. 21, 2006); United States v.
Foley, No. 05 Cr. 391 (HB) (S.D.N.Y. Oct. 10, 2006); United

17

States v. Fee, No. 05 Cr. 398 (PKC) (S.D.N.Y. Sept. 22, 2006).

## The Proposed Class Representatives

Lead Plaintiff CalPERS is the largest public retirement system in the United States. CalPERS manages pension and health benefits for approximately 1.5 million California employees, retirees and their families. As of April 30, 2007, CalPERS' investment portfolio had a market value of $243.9 billion. According to the Amended Complaint, CalPERS purchased and/or sold almost 3 billion shares of NYSE-listed stock between October 17, 1998, and October 15, 2003. Am. Compl. ¶ 17.

Proposed class representative Market Street is a specialist and market maker for options on the Philadelphia Stock Exchange. Market Street purchased and sold more than 280 million shares of stock on the NYSE via SuperDOT during the proposed class period, from January 1, 1999, through October 15, 2003 (the "Class Period").

## The Amended Complaint

18

The Amended Complaint alleges that the Specialist

Firms systematically violated NYSE Rules and federal

securities laws with the knowledge and active participation

of the NYSE.  Specifically, the Specialist Firms are

alleged to have engaged in the following practices:

> (i) "interpositioning" in violation of
> the   Specialist   Firms'   "negative
> obligation," in which a Specialist Firm
> "steps in the way" of matching orders
> of  public  sellers  and/or  buyers  of
> stock to generate riskless profits to
> the detriment of Class members; (ii)
> "trading ahead" or "front-running," in
> which Specialist Firms take advantage
> of  their  confidential  knowledge  of
> public  investors'  orders  .  .  .  and
> trade   for   their   own   account   as
> principals  before  completing  orders
> placed  by  public  investors;  (iii)
> "freezing  the  book,"  in  which  a
> Specialist  Firm  freezes  its  Display
> Book on a stock so it can first engage
> in trades for its own account prior to
> entering  and  then  executing  public
> investors'   orders   .   .   .   (iv)
> manipulating the tick or price of a
> stock to effect principal trades; and
> (v)   falsifying   trade   records   and
> reports to cover up their illegal and
> manipulative practices.

Am. Compl. ¶ 3.  According to the Amended Complaint, each

firm's approximate share of the NYSE annual trading volume

is:  LaBranche LLC (29%); Spear Leeds LLC (20%); VDM

Specialists (12.5%); Fleet Specialist (18%); Bear Wagner

19

LLC (16%); SIG Specialists (3%); and Performance Specialist
(1.5%).  Id. ¶ 19.

## III.  CALPERS' MOTION TO STRIKE IMPROPERLY SUBMITTED LEGAL OPINION IS DENIED

After receiving the Specialist Firms' opposition
to the motion for class certification, CalPERS filed the
instant Motion to Strike Improperly Submitted Legal
Argument in Defendants' Appendix based on the assertion
that the Appendix presents excerpts from trial and
deposition testimony in such a way as to effectively
continue its legal arguments beyond the page limit ordered
by this Court.

In support of their respective positions on class
certification, both CalPERS and the Specialist Firms have
submitted hundreds of pages of testimony from related
government trials and investigations.  The Specialist
Firms' Appendix contains excerpts organized by argument and
contains brief summaries of the excerpted testimony.
Nothing in the Appendix, however, rises to the level of
legal argument, as the Court can easily distinguish (and
just as easily disregard) the summaries providing context
for the excerpts from the excerpts themselves.  Because the

20

Court finds that the Appendix does not constitute an
impermissible continuation of the Specialist Firms' legal
argument, CalPERS' motion is denied.

## IV. THE SPECIALIST FIRMS' MOTION TO STRIKE THE CORWIN AND CURTIN REPORTS IS DENIED

Following Lead Plaintiff's motion for class
certification, the Specialist Firms moved to strike the
Corwin and Curtin Reports. Given the degree to which Lead
Plaintiff's motion for certification relies on these expert
opinions, the motion to strike will be considered before
turning to the motion for class certification.

### The Applicable Legal Standard

The admissibility of expert testimony is governed
by the Federal Rules of Evidence as well as the Supreme
Court's decisions in Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its
progeny. Fed. R. Evid. 702 states:

> If scientific, technical, or other
> specialized knowledge will assist the
> trier of fact to understand the
> evidence or to determine a fact in
> issue, a witness qualified as an expert
> by knowledge, skill, experience,
> training, or education, may testify

21

> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert, the Supreme Court assigned "to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597; see Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147—49 (1999) (applying Daubert to all expert testimony, not just testimony based on "scientific" knowledge).

In considering the reliability of expert testimony, courts may consider whether an expert's theory can be tested, "whether the theory or technique has been subjected to peer review and publication," "the known or potential rate of error", and "general acceptance." Daubert, 509 U.S. at 593-94. However, this "list of factors was meant to be helpful, not definitive," and "neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire, 526 U.S. at 141, 151; see Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266

(2d Cir. 2002) ("[T]he Daubert inquiry is fluid and will
necessarily vary from case to case.").

"While the proponent of expert testimony has the
burden of establishing by a preponderance of the evidence
that the admissibility requirements of Rule 702 are
satisfied, the district court is the ultimate
'gatekeeper.'" United States v. Williams, 506 F.3d 151,
160 (2d Cir. 2007) (internal citation omitted). Although a
court is directed to exercise its discretion, "[t]he Rule's
basic standard of relevance . . . is a liberal one."
Daubert, 509 U.S. at 587. As the Advisory Committee notes,
"[a] review of the caselaw after Daubert shows that the
rejection of expert testimony is the exception rather than
the rule." Fed. R. Evid. 702, Advisory Committee Notes.

The instant motion to strike comes to the Court
not during a full-scale inquiry into the merits, but at the
class certification stage. Although often involving
overlapping facts and arguments, "a motion to strike expert
evidence pursuant to Daubert . . . involves a inquiry
distinct from that for evaluating expert evidence in
support of a motion for class certification . . . ." In re
Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 132

23

n.4 (2d Cir. 2001) (internal citation omitted). Even after
the Court of Appeals' decision in In re Initial Pub. Sec.
Litig., 471 F.3d 24 (2d Cir. 2006) ("In re IPO"), which
requires courts to evaluate all questions of fact that
pertain to class certification, even to the extent that
such facts overlap with the merits, the proper role for a
Daubert inquiry at the class certification stage remains
limited by Rule 23 itself. At this stage, "the Court may
only examine the expert reports as far as they bear on the
Rule 23 determination," Hnot v. Willis Group Holdings Ltd.,
241 F.R.D. 204, 210 (S.D.N.Y. 2007). Accordingly, this
Court's Daubert inquiry is limited to whether or not the
Corwin and Curtin Reports are admissible to establish the
requirements of Rule 23.

## The DOJ Algorithm

In connection with the SEC's investigations of
the Specialist Firms, the NYSE designed and created a
computer algorithm to identify specific stock transactions
where specialists had traded ahead of public orders,
interpositioned themselves between public orders, and
failed to execute public limit orders by trading for their
own personal accounts. OCIE Rep. at 21. In addition to

24

identifying individual violations, often referred to as "exceptions," the algorithm also identified the number of disadvantaged shares and disadvantaged dollar amounts. See Fund Administrator's Modified Fund Distribution Plan ("Distribution Plan") at 5, Pl. Ex. 20. The same algorithm was used, with minor modifications, in the DOJ's criminal investigations of the individual specialists (the "DOJ Algorithm").

The DOJ Algorithm utilizes two parameters designed to ensure accurate reporting of priority rule violations. First, it includes what OCIE refers to as a "freeze parameter." This parameter limits exceptions to trades that occurred between orders having identical Display Book times. Because of the way the Display Book operates, the only time that a given order would appear simultaneously on the Display Book is when the Display Book is frozen by the specialist, often while a clerk is reporting a trade, and orders queued off-screen. OCIE Rep. at 22. According to OCIE, the original purpose of this particular parameter was "to prevent the specialist from being able to argue that he had verbally given the clerk instructions to execute the first order prior to the second

contra-side order arriving to the Display Book." Id. at
21.

The second parameter in the DOJ Algorithm limits
trading ahead exceptions to those proprietary trades that
occur more than ten seconds after the public order first
appears on the Display Book. This ten-second lag provides
for the situation where a specialist "verbally trades with
the crowd, and it takes the clerk some amount of time
before entering into report mode and freezing the Display
Book." Id. at 16. The ten-second lag marks a departure
from the NYSE's previous surveillance programs which
allowed for a more generous 60-second lag. Id. at 15.

## The Expert Reports

In support of its motion for class certification,
CalPERS submitted the Corwin Report, the Rebuttal Report of
Corwin ("Corwin Rebuttal"), the Curtin Report, and the
Rebuttal Report of Curtin ("Curtin Rebuttal"). The Corwin
Report reviews and assesses the results produced by the DOJ
Algorithm and analyzes whether implementing alterations to
the DOJ Algorithm could "more accurately identify violative
conduct." Corwin Rep. at 1. The Curtin Report then uses

26

the NYSE data for 55 representative stocks during the Class

Period to implement Corwin's recommended modifications.

Curtin Rep. at 3.  The Corwin and Curtin Rebuttals were

submitted in response to the Specialist Firms' opposition

to class certification, and specifically address critiques

submitted to the Court by the Specialist Firms' expert, Dr.

Mukesh Bajaj.  See Baja Decl.

> The Corwin Report concludes that:
>
> the general methodology used [in the
> DOJ Algorithm] to identify trading
> violations is appropriate and that the
> algorithm      identifies      significant
> numbers of disadvantaged orders during
> the period from 1999 through 2003.
> However . . . several of the parameters
> used in the DOJ algorithm resulted in a
> failure to identify the many cases of
> interpositioning and trading ahead by
> NYSE specialists.   As a result, the
> disadvantaged dollar amounts based on
> the application of the DOJ's algorithm
> were significantly understated."

Corwin Rep. at 2.  Corwin describes two changes which, when

applied to the DOJ Algorithm, he asserts more accurately

capture and identify interpositioning and trading ahead

violations.

First, Corwin eliminates the requirement in the

DOJ Algorithm that only orders that arrive on the Display

Book during a "freeze" are marked as interpositioning

exceptions. Id. at 10. According to Corwin, "[i]f both

orders are visible on the Display Book prior to the first

specialist trade, interpositioning would result regardless

of whether or not the orders arrived during a freeze." Id.

Based on this logic, Corwin eliminates the "freeze"

restriction from the DOJ Algorithm.

Second, Corwin reduces the lag-time parameter in

the DOJ Algorithm from ten seconds to one second. Corwin

cites OCIE's determination, based on interviews with

specialists and specialist clerks from each of the seven

firms, that "it is extremely rare for the clerk to enter

into report mode [at which time the Display Book is frozen

and a customer order cannot arrive at the specialist's

post] more than two to three seconds after the specialist

instructs the clerk to do so." OCIE Rep. at 16.

Accordingly, Corwin concludes that "[t]he 10-second lag

applied in the identification of trading ahead violations

appears to be a remnant of surveillance parameters in use

at the NYSE for many years." Corwin Rep. at 14. Based on

his belief that the specialist "should be aware of

executable orders on the Display Book almost immediately

after their arrival," Corwin's algorithm reduces lag-time
to at least one second. Id. at 15.

In addition, Corwin makes two minor adjustments
to the DOJ Algorithm in order to correct what he calls
"bugs" in that code. These modifications result in a 0.5%
decrease in identified interpositioning and trading ahead
exceptions and a 0.5% decrease in the total disadvantaged
dollar amount relative to the DOJ Code. Id. at 6 n.6.

According to Corwin, the adjusted algorithm can
be applied to any NYSE stock for any date, including the
full set of NYSE stocks traded between 1999 and 2003. Id.
at 2.

**Discussion**

The Specialist Firms contend that the Corwin and
Curtin Reports are inadmissible under Daubert for several
reasons. First, they argue that the Corwin Report
constitutes inadmissible legal opinion concerning market
practices that Corwin is unqualified to assess. According
to the Specialist Firms, Corwin's modifications to the DOJ
Algorithm are based on an invalid legal interpretation of

29

the NYSE Rules involving the precise moment a trade is
executed. Despite the Specialist Firms' arguments,
however, Corwin has not offered any legal opinion as to how
this Court should apply the NYSE Rules to the Specialist
Firms in this case.

In rendering his opinion regarding the accuracy
of the DOJ Algorithm, Corwin considered the interpretations
of NYSE personnel, as reflected in the OCIE Report, and
came to his own conclusions regarding the most accurate way
to interpret the NYSE data. The notion, however, that in
so doing, Corwin necessarily offers a legal opinion as to
when under NYSE Rules a trade occurs ignores the fact that
the original ten-second parameter used in the DOJ Algorithm
was itself modeled on a 60-second lag, the length of which
was based on interviews with specialists and designed to
foreclose certain defenses involving oral trades. See OCIE
Rep. at 15—16. In his report, Corwin looks to the same
sources to determine that a ten-second lag is overly
conservative. Put simply, Corwin's task requires him to
make choices about what parameters to apply to the data,
choices that he is competent to make given his extensive
experience with this type of data. See Corwin Rep. at 1.

The Specialist Firms cite Marx & Co., Inc. v. Diners' Club Inc., 550 F.2d 505 (2d Cir. 1977), as an example of impermissible legal opinion in the securities context.    In Marx, the Court of Appeals held that the district court erred in admitting expert testimony regarding the legal standards, derived from contract, governing the defendant's conduct.   See id. at 508—09.   By contrast, in this case, Corwin does not draw any conclusions as to whether the Specialist Firms engaged in conduct in violation of the federal securities laws or the NYSE Rules.   Rather, the Corwin Report describes the DOJ's methodology for identifying priority rule violations and proposes modifications that he believes will more accurately reflect violative conduct.   Despite the Specialist Firms' arguments to the contrary, Corwin does not attempt to define what constitutes an exception.   The fact that the NYSE Rules are used to support his conclusions, notably in response to the Specialist Firms' questioning, does not render the opinion inadmissible.

Once the Specialist Firms' characterization of the Corwin Report as a legal opinion is dispensed with, it becomes clear that Corwin's accomplishments render him qualified to analyze and interpret NYSE data of the type

31

used in his report. Corwin is the Viola D. Hank Associate Professor of Finance at the Mendoza College of Business at the University of Notre Dame. His research focuses primarily on the structure of financial markets and has been published in, inter alia, the Journal of Finance, the Journal of Financial Markets, and Financial Management. See Corwin Rep., App. A. In addition to his academic work, Corwin serves on the NASDAQ Economic Advisory Board and has served as a consultant to the NYSE. Id. He is qualified to provide his expert opinion in the instant motion.

The Specialist Firms next attack the Corwin Report on the grounds that it is not reliable under Daubert because it: 1) is based on incorrect facts; 2) is tailor-made for litigation and is not the product of reliable principles; and 3) does not apply methods reliably.

The Specialist Firms base their attack on the reliability of the Corwin Report primarily on Corwin's statements that NYSE trades are complete for purposes of the priority rules when they are reported, rather than when they are orally consummated. However, as Corwin's algorithm is based on the DOJ Algorithm, a disagreement over the proper role of "oral consummation" is insufficient

32

to deem the entire report unreliable under Daubert.   While
the Specialist Firms may object to the one-second lag
adjustment and dispute whether this parameter properly
reflects NYSE practice, a disagreement with an expert is
not a legitimate basis on which to strike that expert's
opinion.   See Daubert, 509 U.S. at 595 ("The focus . . .
must be solely on principles and methodology, not on the
conclusions that they generate."); Amorgianos, 303 F.3d at
266 ("[T]he district court must focus on the principles and
methodology employed by the expert, without regard to the
conclusions the expert has reached or the district court's
belief as to the correctness of those conclusions.").


          Neither does the fact that the DOJ Algorithm was
modified specifically for this litigation render the Corwin
Report inadmissible.   Although a court may consider whether
an expert's opinion or theory was developed specifically
for the litigation at hand, see e.g., In re Rezulin Prods.
Liab. Litig., 369 F. Supp. 2d 398, 420 (S.D.N.Y. 2005), the
reality of class action litigation dictates that many
experts will be drawing conclusions and offering opinions
based on a combination of past research and the unique
circumstances of a given case.   Here, Corwin has made
adjustments to the DOJ Algorithm which both increase and

decrease, albeit much more insubstantially, the number of
disadvantaged trades. The fact that Corwin has adjusted
the DOJ algorithm specifically to account for the
circumstances described in the Amended Complaint does not,
on its own, render the opinion inadmissible.

Finally, the Specialist Firms challenge the
Corwin Report for failing to adequately account for obvious
alternative explanations. See, e.g., id. ("Courts have
considered . . . whether the expert has accounted
adequately for obvious alternative explanations."); Israel
v. Spring Indus., Inc., No. 98 Civ. 5106, 2006 WL 3196956,
at *5 (E.D.N.Y. Nov. 3, 2006) ("While an expert need not
rule out every potential cause in order to satisfy Daubert,
the expert's testimony must at least address obvious
alternative causes and provide a reasonable explanation for
dismissing specific alternate factors identified by the
defendant."). In objecting to the Corwin Report and the
algorithm applied therein based on its inability to
identify and address alternative explanations, the
Specialist Firms largely mis-state the nature of the
algorithm itself. In all three versions of the algorithm—
the SEC, DOJ, and Corwin iterations—each data point or
trade passes through a series of filters and screens before

34

being identified as an "exception." Although the Corwin
Report reflects significant modifications to these filters,
Corwin provides adequate explanations for each of the
changes he imposes to the DOJ Algorithm to survive a
Daubert challenge. Whether the filters fail to screen out
some trades where alternative explanations would prevent
recovery will be discussed in more detail below. For now,
however, both the Corwin and Curtin Reports are admitted
for the limited purpose of determining whether Rule 23 has
been satisfied.

## V. CalPERS' MOTION FOR CLASS CERTIFICATION IS GRANTED

CalPERS has moved, pursuant to Rule 23, Fed. R.
Civ. P., for an order certifying this consolidated action
as a class action on behalf of all persons and entities who
submitted orders (directly or through agents) to purchase
or sell NYSE-listed securities during the Class Period,
which orders were listed on the specialists' Display Book
and subsequently disadvantaged by Defendants, and naming
CalPERS and Market Street class representatives. Based on
the following, the Court grants Lead Plaintiff's motion for
class certification and names CalPERS and Market Street as
class representatives.

35

**The Applicable Legal Standard**

It is well established that "[c]lass
certification is warranted under Rule 23 where the proposed
class representative meets the standards of Rule 23(a)—
numerosity, commonality, typicality, and adequacy—and the
proposed class action meets the requirements of one of the
subsections of Rule 23(b)." In re Salomon Analyst
Metromedia Litig., 544 F.3d 474, 478 (2d Cir. 2008); see
Fed. R. Civ. P. 23(a). Here, CalPERS seeks certification
under Rule 23(b)(3), which requires plaintiffs to
demonstrate that "questions of law or fact common to class
members predominate over any questions affecting only
individual members, and that a class action is superior to
other available methods for fairly and efficiently
adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

As mentioned briefly above, the Court of Appeals
recently clarified the standard by which a court in this
district is to determine whether plaintiffs seeking class
certification have met their Rule 23 burdens:

> (1) a district judge may certify a
> class only after making determinations
> that each of the Rule 23 requirements

36

> has been met; (2) such determinations
> can be made only if the judge resolves
> factual disputes relevant to each Rule
> 23 requirement and finds that whatever
> underlying facts are relevant to a
> particular Rule 23 requirement have
> been established and is persuaded to
> rule, based on the relevant facts and
> the applicable legal standard, that the
> requirement is met; (3) the obligation
> to make such determinations is not
> lessened by overlap between a Rule 23
> requirement and a merits issue, even a
> merits issue that is identical with a
> Rule 23 requirement . . . ."

In re IPO, 471 F.3d at 41; see Teamsters Local 445 Freight

Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d

Cir. 2008) ("[In In re IPO w]e disavowed any implication in

our earlier decisions that the 'some showing' standard may

apply to Rule 23 issues and required district courts 'to

assess all of the relevant evidence admitted at the class

certification stage' . . . .").


While the Court of Appeals now requires district

courts to dive deeper into the facts at the class

certification stage, "the holdings of In re IPO are both

significant and narrow—a district judge must consider all

of the relevant evidence in determining whether Rule 23 has

been satisfied, but a district judge may not go beyond the

boundaries of Rule 23 when making such a determination."
Hnot, 241 F.R.D. at 209.

## The Rule 23(a) Requirements

### 1. Numerosity

The first prerequisite for class certification
requires that the class be "so numerous that joinder of all
members is impracticable." Fed. R. Civ. P. 23(a)(1).
Numerosity is presumed when a class consists of forty
members or more. Consol. Rail Corp. v. Town of Hyde Park,
47 F.3d 473, 483 (2d Cir. 1995). In securities class
actions "relating to publicly owned and nationally listed
corporations, the numerosity requirement may be satisfied
by a showing that a large number of shares were outstanding
and traded during the relevant period." In re Vivendi
Universal, S.A. Sec. Litig., 242 F.R.D. 76, 84 (S.D.N.Y.
2007) (internal quotations and citation omitted).

During the proposed Class Period, the NYSE listed
approximately 2,800 companies, and the average daily volume
of all stocks traded was approximately 1,239,721,621
shares. See Pl. Ex. 46. In replicating the DOJ Algorithm

38

for the 55 representative stock symbols for which CalPERS
has data, it has already identified 1.1 million violative
trade pairs. See Corwin Rep. at 5. Given that millions of
trades of publicly-held stock occurred daily on the NYSE,
and that the Specialist Defendants have not challenged
numerosity, Lead Plaintiffs have established that the
proposed class satisfies the numerosity requirement and
that joinder is impracticable.

## 2.  Commonality

To establish commonality, a plaintiff must
demonstrate that "there are questions of law or fact common
to the class."  Fed. R. Civ. P. 23(a)(2).  "The commonality
requirement is met if plaintiffs' grievances share a common
question of law or fact.  Even a single common legal or
factual question will suffice."  Freeland v. AT&T Corp.,
238 F.R.D. 130, 140 (S.D.N.Y. 2006) (internal quotations
and citations omitted).

Lead Plaintiff alleges that questions of law and
fact common to the class include:

> (1)whether      Defendants      implemented
> manipulative acts, devices or contrivances
> or  engaged  in  the  alleged  fraudulent

39

> scheme and course of business; (2) whether
> Defendants omitted material facts and
> concealed material information regarding
> the trading practices of the Specialist
> Firms; (3) whether Defendants violated the
> Exchange Act; (4) whether Defendants knew
> or recklessly disregarded that the
> allegedly false statements and omissions
> made by the them and others participating
> in the scheme were false and misleading;
> (5) whether the trading prices of shares
> purchased and sold were artificially
> manipulated and/or distorted by
> Defendants' conduct; and (6) the extent of
> damage sustained by class members and the
> appropriate measure of damages.

See Am. Compl. ¶ 26.

The Court agrees with CalPERS that, at this

stage, it has demonstrated that these issues are common to

the class. See Freeland, 238 F.R.D. at 140 (finding

commonality requirement satisfied while noting that the

predominance requirement of Rule 23(b)(3) is more stringent

and "therefore more often the focus of contention when

there is a motion to certify a damages class"). Again, the

Specialist Firms have not argued that CalPERS' allegations

would not support a finding of commonality in this case,

and accordingly, commonality is established.

### 3. Typicality

40

Similarly, Rule 23(a)(3)'s typicality requirement
is satisfied when "each class member's claim arises from
the same course of events, and each class member makes
similar legal arguments to prove the defendant's
liability'" Robinson v. Metro-North Commuter R.R. Co., 267
F.3d 147, 155 (2d Cir. 2001) (internal quotation and
citation omitted). "[T]he requirements of commonality and
typically 'tend to merge' because '[b]oth serve as
guideposts for determining whether . . . the named
plaintiff's claim and the class claims are so inter-related
that the interests of the class members will be fairly and
adequately protected in their absence.'" Velez v. Novartis
Pharm. Corp., 244 F.R.D. 243, 257 (S.D.N.Y. 2007) (quoting
Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157
n.13 (1982)) (alterations in original). "The crux of both
requirements is to ensure that maintenance of a class
action is economical and that the named plaintiff's claims
and the class claims are so interrelated that the interests
of the class members will be fairly and adequately
protected in their absence." Marisol A. v. Guiliani, 126
F.3d 372, 376 (2d Cir. 1997).

Although "the mere existence of individualized
factual questions with respect to the class

representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) (internal quotations and citations omitted). "The unique defense rule, however, is not rigidly applied in this Circuit," and is "intended to protect plaintiff class—not to shield defendants from a potentially meritorious suit." In re Parmalat Sec. Litig., No. 04 MD 1653 (LAK), 2008 WL 3895539, at *5 (S.D.N.Y. Aug. 21, 2008) (internal quotations and citations omitted).

In this case, Lead Plaintiff seeks certification of a class consisting of all persons and entities who submitted orders to purchase or sell NYSE-listed securities during the Class Period, which orders were listed on the specialists' Display Book and subsequently disadvantaged by Defendants. All members of the proposed class allege injuries resulting from the Specialist Firms' improper trading ahead and interpositioning, including CalPERS and Market Street.

However, the Specialist Firms contend that
CalPERS and Market Street are atypical of other members of
the class. They first argue that since neither CalPERS nor
Market Street has submitted evidence of any disadvantaged
trades, other than those already covered by the regulatory
settlements, they have not met their burden of establishing
that they are members of the class that they seek to
represent. See Cordes & Co. Fin. Servs., Inc., v. A.G.
Edwards & Sons, Inc., 502 F.3d 91, 99 (2d Cir. 2007) ("To
have standing to sue as a class representative it is
essential that a plaintiff . . . be a part of that class,
that is, he must possess the same interest and suffer the
same injury shared by all members of the class he
represents." (internal quotations and citation omitted)).

This argument is unavailing in its attempt to
portray CalPERS and Market Street as atypical class
members.  Both CalPERS and Market Street purchased and sold
millions of shares of stock on the NYSE during the Class
Period.  See CalPERS Certification, Pl. Ex. 49; Cheseldine
Decl. ¶ 2.  And like all class members, CalPERS and Market
Street rely on the DOJ Algorithm, as modified by Corwin, to
identify priority rule violations.  Given the unique
circumstances of this purported securities class action,

43

and the fact that at this time, data has only been obtained
by Lead Plaintiff for 55 representative stocks, CalPERS and
Market Street's failure to point to specific violative
trades beyond those identified in the SEC's investigation
is not fatal to its motion for certification. The purpose
of the Rule 23(a) typicality requirement is to ensure that
a class representative has "the incentive to prove all the
elements of the cause of action which would be presented by
the individual members of the class were they initiating
individualized actions." In re NASDAQ Market-Makers
Antitrust Litig., 172 F.R.D. 119, 126 (S.D.N.Y. 1997)
(internal quotation and citation omitted). Indeed, CalPERS
and Market Street's inability to definitively identify
exceptions absent the full NYSE data for the Class Period
demonstrates their typicality.

The Specialist Firms also argue that both CalPERS
and Market Street are subject to unique defenses. By
identifying several unique defenses to which the proposed
class representatives might be subject, the Specialist
Firms seek to differentiate CalPERS and Market Street from
the rest of the class. It is, therefore, necessary to
examine these defenses to determine whether either

threatens "to become the focus of the litigation." Baffa,
222 F.3d at 59.

First, the Specialist Firms allege that since
CalPERS evaluates quality of execution by measuring the
volume-weighted average price ("VWAP") of each order,
CalPERS is subject to a unique defense from those
Specialist Firms with an affiliate brokerage service used
by CalPERS, namely Goldman Sachs, Bear Stearns, and Fleet.
These Specialist Firms, the argument goes, had incentives
to provide best execution to CalPERS in order to increase
the ranking of their affiliate brokers. The Specialist
Firms also argue that by relying on the VWAP, CalPERS "was
not sensitive to minor variations in execution quality,
unlike class members who did not depend on VWAP." Bajaj
Decl. ¶ 112.

Notably, however, the Specialist Firms have cited
no cases in support of the purported significance of
CalPERS's strategy on this case. The fact that CalPERS
relies on a particular benchmark to evaluate trades does
not lead to the conclusion that CalPERS has less of an
interest than other class members in demonstrating that the
Specialist Firms violated their obligations. Neither does

CalPERS' use of a particular trading strategy threaten to become the focus of this litigation.

With respect to Market Street, the Specialist Firms allege that Market Street is subject to a statute of limitations defense on inquiry notice grounds because of a statement made by the firm's president, Stephen Cheseldine, that he suspected that NYSE specialists were not executing its trades in compliance with the priority rules. Cheseldine Dep., Vol. II, at 211, Def. Ex. B326.

In the securities fraud context, inquiry notice exists "when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud." Dodds v. Cigna Sec., Inc., 220 F.3d 346, 350 (2d Cir. 1993); see also December 2005 Opinion, at 312 n.13. Standing alone, Cheseldine's statement that he had "certainly wondered why [he] didn't get certain trades," Cheseldine Dep., at 211, is not enough to put him on inquiry notice of wrongdoing, and the Specialist Firms have not alleged any additional facts that would indicate that, at this time, Market Street is susceptible to a statute of limitations defense that would threaten to become the focus of this litigation. See In re Parmalat, 2008 WL 3895539, at *5 (stating that "a

representative may satisfy the typicality requirement even
though that party may later be barred from recovery by a
defense particular to him that would not impact other class
members") (internal quotations and citation omitted)).

Finally, defendants argue that Market Street does
not satisfy the typicality requirement because it is a
market maker whose purchases and sales of securities were
conducted almost exclusively to hedge its options
positions. Citing cases from outside this District, the
Specialist Firms argue that courts routinely reject
attempts by market makers to serve as class
representatives. See Tice v. NovaStar Fin., Inc., No. 04-
0330-CV, 2004 WL 1895180, at *5 (W.D. Mo. Aug. 23, 2004)
("Courts have found market makers to be atypical of a class
because they are subject to unique defenses regarding their
reliance, or lack thereof, on the alleged fraud."); Seamans
v. Aid Auto Stores, Inc., No. 98-CV-7395, 2000 WL 33769023,
*4 (E.D.N.Y. Feb. 15, 2000) (finding market maker atypical
of class); Queen Uno Ltd. P'ship v. Coeur D'Alene Mines
Corp., 183 F.R.D. 687, 692 (D. Colo. 1998) (concluding that
market marker could not serve as class representative where
it was alleged that proposed class representative traded in

defendant's stock because of its obligation to do so as market maker on the Chicago Board of Trade).

In this District, however, the fact that Market Street has sold securities to hedge its portfolio does not preclude it from representing other buyers. To the contrary, it is recognized that "where the public market of a quoted security is polluted by false information, or where price, supply and demand are distorted as a result of misleading omissions, all types of investors are injured[,]" including market makers. In re Oxford Health Plans, Inc., Sec. Litig., 199 F.R.D. 119, 124 (S.D.N.Y. 2001) (internal quotations and citation omitted). Concerns involving market makers and unique defenses are even less relevant here since, unlike in the cases cited by the Specialist Firms, Market Street is only registered as a market maker on the Philadelphia Exchange, and therefore it trades solely for its own account in transactions involving the Specialist Firms on the NYSE. See Cheseldine Dep., Vol. I, at 26—27, Pl. Ex. N.

"As long as plaintiffs assert, as they do here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they

48

establish [the] necessary typicality." In re Towers Fin.
Corp. Noteholders Litig., 177 F.R.D. 167, 170 (S.D.N.Y.
1997) (internal quotation marks and citation omitted); see
Robidoux v. Celani, 987 F.2d 931, 936—37 (2d Cir. 1993)
("When it is alleged that the same unlawful conduct was
directed at or affected both the named plaintiff and the
class sought to be represented, the typicality requirement
is usually met irrespective of minor variations in the fact
patterns underlying individual claims."). Since the
Specialist Firms have presented no evidence that CalPERS
and Market Street allege different wrongful conduct or are
subject to unique defenses that render them atypical of
other class members, the typicality requirement is
satisfied.

## 4. Adequacy of Representation

The final requirement of Rule 23(a) is adequacy
of representation, necessitating a showing that "the
representative parties will fairly and adequately protect
the interests of the class." Fed. R. Civ. P. 23(a)(4).
"[A]dequacy of representation entails inquiry as to
whether: 1) plaintiff's interests are antagonistic to the
interest of other members of the class and 2) plaintiff's

49

attorneys are qualified, experienced and able to conduct the litigation." Baffa, F.3d at 60. The analysis focuses on whether the proposed class representatives possess "the same interest and suffer the same injury as the class members." Amchem Prods. v. Windsor, 521 U.S. 591, 625-26 (1997)(internal quotations and citation omitted). The focus is on uncovering "conflicts of interest between named parties and the class they seek to represent." Id. at 625.

The Specialist Firms contend that "fundamental" conflicts within the purported class render it uncertifiable. See In re Visa, 280 F.3d at 145 (2d Cir. 2001) ("The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental . . . ." (internal quotations and citation omitted)). Defendants raise three potential conflicts: 1) between buyers and sellers with respect to the "interpositioning" claim; 2) between buyers and sellers regarding whether a trade is characterized as "interpositioning" or "trading ahead;" and 3) between buyers and sellers related to the allocation of injury among class members.

None of the various conflicts cited by the Specialist Firms defeat Lead Plaintiff's showing of

50

adequacy. Both CalPERS and Market Street have raised claims typical of those of the other class members in that they arise due to the Specialist Firms' alleged manipulative stock trading activities and false statements and are based on identical legal and remedial theories. Further, they assert identical harm, regardless of whether the violative trades involved purchases or sales of stock. Despite the Specialist Firms' arguments to the contrary, the mere presence of purchasers and sellers in a given class does not provide a basis for denying class certification unless the "asserted 'conflict' is so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 514—15 (S.D.N.Y. 1996). The Specialist Firms have not shown that such a conflict exists in this case.

The Specialist Firms cite United Egg Producers v. Bauer Int'l Corp., 312 F. Supp. 319 (S.D.N.Y. 1970), for the proposition that buyer-seller conflicts necessarily create irreconcilable conflicts for putative class representatives seeking to represent both. However, in United Egg, the defendant-counterclaimant seeking to represent "all consumers of eggs in the United States who

are similarly situated" against a cooperative of egg
producers was also an importer and supplier of eggs. Based
on its conclusion that Bauer's "first allegiance is not to
consumers but to himself as an importer and supplier of
eggs," the court found Bauer an inadequate class
representative. See id. at 321. Here, both proposed class
representatives engaged in trades during the Class Period
as both buyer and seller. There is no evidence that either
CalPERS or Market Street has any "allegiance" that would
prevent it from serving as class representative.

The Specialist Firms next argue that class
members here will inevitably conflict over the
characterization of individual trades as "interpositioning"
or "trading ahead," and that this conflict will prove
insurmountable. Conflicts over the characterization of
harm ultimately implicate the allocation of injury and
damages, essentially boiling down to who suffered injury
and how much. Conflicts over damages, at this early stage
in the litigation, need not defeat a motion for
certification. See, e.g., In re WorldCom, 219 F.R.D. at
302 ("When liability can be determined on a class-wide
basis, individualized damage issues are not ordinarily a
bar to class certification.").

The Specialist Firms' argument that since ascertaining members of buyer/seller sub-classes is impracticable at this stage, class certification should be denied also misses the mark. If, in the future, it becomes clear that intra-class conflicts related to damages require the creation of sub-classes, then the Court will address the issue at that time. "To the extent that different formulas may apply to the calculation of any damages suffered . . . this Court can order certification of appropriate sub-classes at a later juncture within its broad discretion in arranging the structure of a class action litigation . . . ." Constance Sczesny Trust v. KPMG LLP, 223 F.R.D. 319, 325 (S.D.N.Y. 2004); see, e.g., In re Austrian & German Bank Holocaust Litig., 317 F.3d 91, 103– 04 (2d Cir. 2003) ("In some circumstances a court itself might well have an obligation on its own motion, especially when called upon to approve a class action settlement, to designate a subclass and assure proper representation for the subclass, or to take other appropriate steps to lessen if not eliminate the potential for a conflict among class members.").

Finally, the Specialist Firms argue that Market Street is an inadequate class representative because it is already overburdened by numerous lawsuits in which it serves as plaintiff. In challenging the adequacy of Market Street to serve as class representative, the Specialist Firms rely on a comment made by Cheseldine that he spends "[t]oo much" time a week on litigation. Cheseldine Dep. at 254, Def. Ex. B349. Accordingly to the Specialist Firms, Cheseldine also had difficulty recalling the full number and details of cases in which Market Street currently serves as a plaintiff. See id. at 247–48, 250–70.

However, "named plaintiffs are not expected to possess expert knowledge of the details of the case and must be expected to rely on expert counsel." Baffa, 222 F.3d at 61. Only "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorney" may a court deny class representative status. Id. (internal quotations and citation omitted). Here, the Specialist Firms' allegations that Market Street's president is overburdened by litigation are not supported by sufficient evidence for the

Court to conclude that Market Street is not an adequate class representative.

As to the second prong, the Specialist Firms have not challenged, in this motion, the qualifications, experience, or ability of counsel for Lead Plaintiff, Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin"), to conduct this litigation. Given Coughlin's substantial experience in securities class action litigation and the extensive discovery already conducted in this case, this element of adequacy has also been satisfied.

## The Rule 23(b)(3) Requirements: Predominance and Superiority

Once a party has demonstrated, by a preponderance of the evidence, that the requirements of Rule 23(a) have been established, the Court must then turn to Rule 23(b) and determine whether plaintiff meets the requirements of one of its sub-sections. Here, CalPERS seeks certification under Rule 23(b)(3), which provides that a suit may be maintained as a class action if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating
the controversy." Fed. R. Civ. P. 23(b)(3).

## 1. Predominance

"The Rule 23(b)(3) predominance inquiry tests
whether proposed classes are sufficiently cohesive to
warrant adjudication by representation." Amchem Prods.,
521 U.S. at 623. It is "more demanding than the
commonality determination required by Rule 23(a)," In re
Worldcom, 219 F.R.D. at 279, and requires that issues that
are subject to generalized proof outweigh those subject to
individualized proof. See Heerwagen v. Clear Channel
Commc'ns, 435 F.3d 219, 226 (2d Cir. 2006).

At the same time, predominance does not require a
plaintiff to show that there are no individual issues. See
Dura-Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 99
(S.D.N.Y. 1981) ("[I]ndividual issues will likely arise in
this as in all class action cases. But, to allow various
secondary issues of plaintiffs' claim to preclude
certification of a class would render the rule an impotent
tool for private enforcement of the securities laws.").
Indeed, [p]redominance is a test readily met in certain

56

cases alleging . . . securities fraud." Amchem Prods., 521
U.S. at 625. In deciding whether the Rule 23(b)(3)
elements have been satisfied, "the district court must make
a 'definitive assessment of Rule 23 requirements,
notwithstanding their overlap with merits issues.'" Cordes
& Co., 502 F.3d at 108 (quoting In re IPO, 471 F.3d at 41).

In its Amended Complaint, CalPERS alleges that
the Specialist Firms violated Sections 10(b) and 20(a) of
the Securities Exchange Act of 1934 and Rule 10b-5
promulgated thereunder. To succeed on its 10(b) claims,
CalPERS must establish the following four elements: 1) a
material misrepresentation or omission, or a manipulative
or deceptive act; 2) scienter; 3) causation, including
reliance; and 4) economic loss or injury. See Stoneridge
Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct.
761, 768 (2008). In addition to establishing a primary
10(b) violation, CalPERS' Section 20(a) claims require
proof of control by the defendant over the primary
violator. See In re Parmalat Sec. Litig., 376 F. Supp. 2d
472, 515 (S.D.N.Y. 2005).

**1. Deceptive or Manipulative Act/Misstatement**

The Amended Complaint alleges that the Specialist
Firms engaged in priority rule violations that were
"deceptive" under 10b-5(a) and (c), and rendered certain
statements made by the Specialist Firms regarding priority
execution false under 10b-5(b). CalPERS contends that its
surveillance software, discussed in more detail above, is
able to identify the Specialist Firms' illegal conduct in a
uniform manner and can be used to determine whether illegal
conduct occurred without necessitating a trade-by-trade
review.

According to the Specialist Firms, proof of each
alleged priority rule violation turns on facts specific to
each individual trade, including when the order arrived on
the Display Book, when and how the trade was executed, and
whether the trade was reported by the clerk in order to
correct a prior error. The Specialist Firms' argument is
based on the notion that a trade that occurs on the NYSE
floor, rather than through the SuperDOT system, is executed
not when it is entered into the Display Book, but when it
is "orally consummated." The Specialist Firms have
submitted deposition testimony and testimony from the
government trials to support their argument. For example,
Edward Kwalwasser, Executive Vice President of the NYSE

Regulatory Group, describes the way in which an oral trade

is executed as follows:

> Q.  When is the trade consummated?
>
> A.  When the specialist says done.
>
> Q.  The specialist says done after he's gotten
>     the terms of the orders and the badge
>     numbers?
>
> A.  No.
>
> Q.  So explain that clearly to us?
>
> A.  There are [sic] a specialist is offering a
>     half million shares, there are people who
>     want to buy a half million shares, they all
>     indicate to him that they want to buy the
>     stock at 16, let's pick a number.  He will
>     say "done."
>
> Q.  Okay.
>
> A.  He will then collect all of the information
>     that he needs, because it's important to get
>     the trade done because the market is moving .
>     . . So the specialist will then get the badge
>     numbers of the folks that he dealt with, and
>     what the amount to make sure that I'm correct
>     . . . He then communicates that to his clerk.
>
> Q.  So that's after he said "done," he is then
>     relaying the information to the clerk, and
>     then what happens?
>
> A.  Then the clerk reports that trade to the tape
>     and to the comparison settlement system and
>     when the clerk finishes that report and
>     presses done . . . .

Def. Opp. Br., App. at 1.  Since oral trades are not

recorded or reflected in the NYSE's data, oral consummation

can lead to "false positives." As the witness quoted above
testified: "The false positive are orders that had . . .
come in between the time that the specialist said 'done'
and the time he collected the information that his clerk
went into the report mode." Id. at 2. The Specialist
Firms argue that Corwin's algorithm necessarily identifies
false positives in these circumstances.[2] Any trade
identified by the algorithm as an exception, then, would be
open to a fact-specific defense that it was orally
consummated and merely reflects the delayed reporting of
such an oral execution. According to the Specialist Firms,
the algorithm is incapable of weeding out such false
positives on a class-wide basis.

CalPERS disputes not only the existence of the
"oral consummation rule," but also the Specialist Firms'
characterization of the way trades are conducted on the
NYSE floor and reflected in the NYSE data. According to
CalPERS, NYSE data records identify, to the fraction of a
second, when a customer's electronic order arrives on the

---

[2] This argument was anticipated by the NYSE and incorporated into the
DOJ Algorithm in the form of the ten-second lag and freeze parameters.
See OCIE Rep. at 16, 21 ("The Exchange chose to include orders with the
same Display Book time to prevent the specialist from being able to
argue that he had verbally given the clerk instructions to execute the
first order prior to the second contra-side order arriving to the
Display Book.").

Display Book.  See Corwin Rebuttal ¶ 4.  For purposes of
the algorithm, the time an order arrives on the Display
Book is denoted as "DBTIME."  Id.  DBTIME is then compared
to the time the transaction is electronically reported by
the specialist into the Display Book ("RTIME").  Corwin's
algorithm treats RTIME as equivalent to the time an order
was executed, and therefore, CalPERS asserts, provides an
accurate data point on which to determine whether a
priority rule violation occurred.

        The evidence demonstrates that CalPERS is more
than justified in equating RTIME with execution time to
identify violative conduct on a class-wide basis.  Indeed,
the use of RTIME as execution time was adopted in the
algorithms used by both the SEC and DOJ in their
investigations.[3]  See Corwin Rebuttal ¶ 10.  Further, an
NYSE programmer involved with the DOJ Algorithm testified,
pursuant to a stipulation, in the government trials that
RTIME is the time a transaction occurs and is executed in
the Display Book.  See, e.g., United States v. Finnerty,
No. 05 Cr. 393 (S.D.N.Y. Oct. 23, 2006).  Indeed, the

---

[3] It must be noted, however, that the lag and freeze parameters,
effectively eliminated in CalPERS' algorithm, minimized the
significance of defining execution in this way in the SEC and DOJ
investigations.

Specialist Firms themselves rely on RTIME in data reports on execution quality. Corwin Rebuttal ¶ 7.

The Specialist Firms, on the other hand, rely on the testimony of specialists, clerks, and NYSE officials to prove the existence of the oral consummation rule. See Def. Opp. to Class Certification, App. They have, however, pointed to no NYSE rule recognizing or defining "oral consummation" in the way they suggest.

Without determining whether the oral consummation exists, the Court is convinced that CalPERS can identify violative using primarily common proof. Assuming that oral trades are executed at the time the deal is reached on the floor and not at the time the trade is electronically reported, oral trades represent a relatively small percentage of trades involving floor brokers. See Corwin Rebuttal ¶ 6. More importantly, however, the Specialist Firms have not convinced the Court that the algorithm CalPERS proposes cannot be adjusted to account for "oral consummation" or other similar issues. According to Corwin, the algorithm

> could easily be modified to account for "oral consummation" of trades, if necessary. All that would be required

> is an increase in the lag between
> system order display time and
> specialist trade time for the subset of
> orders involving a floor broker. The
> change in parameter values would in no
> way limit the ability of the algorithm
> to identify cases of interpositioning
> and trading ahead violations.

Corwin Rebuttal ¶ 11, n.8.

The Specialist Firms counter that CalPERS'
algorithm cannot be adjusted to account for several other
problems with the NYSE data, including unreliable data
points and hectic market conditions that lead to harmless
errors. The Specialist Firms direct the Court's attention
to an exception to NYSE Rule 92 which permits specialists
to step ahead of public trade orders in order to correct
"bona fide" errors, arguing that the algorithm mistakenly
identifies such trades as exceptions.

The Court, does not, however, agree with the
Specialist Firms that these concerns cannot be adequately
addressed in the class action context. The fact that
algorithm is potentially over-inclusive in identifying
violative conduct does not, therefore, call into doubt the
ability of CalPERS to identify violative transactions on a
primarily class-wide basis. Indeed, the evidence

63

presented by CalPERS shows that the Specialist Firms'
claims of the extent to which harmless error can account
for exceptions identified by the algorithm are exaggerated.
Corwin's analysis suggests that these errors are "extremely
rare." Corwin Rebuttal ¶ 13. The Specialist Firms, by
contrast, have not identified what percentage of violations
identified by the algorithm are the result of bona fide
error.

        Through use of the DOJ Algorithm, as modified by
Corwin, CalPERS has demonstrated that it will be able to
identify priority rule violations with common proof.
Although the Specialist Firms raise several areas in which
the proposed algorithm might be improved to eliminate the
possibility of false positives, they have not demonstrated
that individual issues will predominate on this initial
element of CalPERS' 10(b)-5 claims.

## 2. Scienter

        According to the Specialist Firms, CalPERS has
failed to demonstrate how scienter can be established using
evidence common to the putative class. Looking to the SEC
and DOJ investigations, the Specialist Firms argue that

since no scienter was alleged with respect to the majority
of the trades flagged by the DOJ Algorithm, CalPERS will
similarly be unable to establish scienter here.

CalPERS, however, has submitted sufficient
evidence to demonstrate that it can prove scienter on a
class-wide basis.  This Court has previously held that the
SEC settlement orders and the Complaint were "more than
sufficient to support a strong inference that the
Specialist Firms engaged in interpositioning and trading
ahead with scienter throughout the Class Period."  December
2005 Opinion, at 313—14.  Unlike the government, CalPERS is
not required to prove scienter for any one individual
specialist.  Rather, it must be able to prove that scienter
existed on a firm-wide basis.  To date, CalPERS has
identified over four million priority rule violations by
the Specialist Firms, and has submitted findings and
testimony from both the SEC and government trials showing
that high-level members of the Specialist Firms were not
only aware of these violations, but instructed specialists
to trade on the firms' principal account instead of
matching public customer orders.  See e.g., United States
v. Hayward, No. 05 Cr. 390 (S.D.N.Y. June 27, 2006); Corwin
Rebuttal ¶ 59.

Since CalPERS has presented sufficient evidence
to indicate that it will be able to prove scienter on a
class-wide basis, and the Specialist Firms have not
convinced the Court otherwise, this element of Rule
23(b)(3) is similarly satisfied.

## 3. Reliance

As both parties recognize, the facts of this case
are unusual in the securities fraud class action context.
See December 2005 Opinion, at 315 (relying on observation
that "the facts present here do not constitute the typical
case" to distinguish Dura Pharm., Inc. v. Broudo, 544 U.S.
336 (2005)). Rather than alleging wrongful conduct that
resulted in the value of security being artificially
inflated, the Specialist Firms are alleged to have profited
from their position by trading for their own proprietary
interest when federal securities law and the NYSE Rules
required otherwise. Based on these unique circumstances,
the Specialist Firms contend that CalPERS cannot prove
reliance on a class-wide basis.

CalPERS claims that it can prove reliance with common proof. First, it invokes Basic v. Levinson, 485 U.S. 224 (1988), for the presumption that all purchasers and sellers of securities rely on the efficiency of the market in making their trades. See Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999) ("The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."). Since the Amended Complaint alleges market manipulation, CalPERS argues, individual proof of reliance is not required. See December 2005 Opinion, at 319 ("Plaintiffs may be presumed to have relied upon information indicating that securities would be matched by specialists, as opposed to be bought and sold at artificially high and low prices.").

Second, in connection with its claims related to the Specialist Firms' misstatements, CalPERS argues, and this Court has previously agreed, that the fraud-on-the-market theory applies. See Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004) ("The fraud-on-the-market doctrine, as described by the Supreme Court in Basic v. Levinson, creates a rebuttable presumption that (1)

misrepresentations by an issuer affect the price for
securities traded in the open market, and (2) investors
rely on the market price of securities as an accurate
measure of their intrinsic value."); see December 2005
Opinion, at 319 ("Plaintiff's allegations fall within the
fraud-on-the-market doctrine and reliance upon the alleged
misrepresentations is presumed.").

Relying on dicta from the Court of Appeals'
decision in this case, the Specialist Firms disagree with
the Court's conclusion that the fraud-on-the-market theory
applies. In reversing this Court's order dismissing claims
against the NYSE, the Court of Appeals wrote that, "Lead
Plaintiffs' Rule 10b-5 claims do not appear to be of the
nature where the fraud-on-the-market theory would apply,
where the misrepresentation itself affects the market price
of the security purchased." In re NYSE Specialists, 403
F.3d at 103. However, the Specialist Firms fail to
acknowledge that the Court of Appeals' statements regarding
reliance were in reference to Lead Plaintiffs' 10b-5 claims
against the NYSE, not the Specialist Firms. Having
remanded the issue of whether plaintiffs' 10b-5(b) claims
against the NYSE should be dismissed for reasons other than
lack of standing, the Court acknowledged that "[w]ithout a

clear understanding as to what Lead Plaintiffs' theory of reliance is" it could not issue an opinion on the NYSE's other stated grounds for dismissal, namely whether CalPERS had sufficiently plead reliance on the NYSE's misstatements to sustain a claim against it. Id. at 102—03. These statements related to the applicability of the fraud-on-the-market theory of reliance solely involve 10b-5(b) claims against the NYSE are not relevant to any of the claims asserted against the Specialist Firms.

Still, the Specialist Firms urge this Court to reverse course and treat this action as a best execution case, rather a market manipulation case. The Specialist Firms rely on Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154 (3d Cir. 2001), to support their argument that individual issues will predominate. In Newton, plaintiffs alleged that defendants, broker-dealers on NASDAQ, violated their duty of best execution by failing to investigate feasible alternatives to the central system, thereby executing orders at unfavorable prices. There, the Court held that the fraud-on-the-market presumption did not apply because "plaintiffs' claims do not involve an omission or misrepresentation that affected the value of security." Id. at 175—76. Here, however, this Court has

already determined that "the fraud-on-the-market doctrine is applicable to misstatements about specific securities as well as misstatements about the marketplace for those securities." December 2005 Opinion, at 318.

According to the Specialist Firms, the relevant market for purposes of establishing reliance is not the NYSE, but the market for execution services. Citing In re IPO, they argue that the fraud-on-the-market presumption does not apply outside the limited context of statements by issuers concerning securities traded in an efficient market. In re IPO, 471 F.3d at 42-43. Denying class certification, the Court in In re IPO, however, held that plaintiffs could not establish a fraud-on-the-market theory of reliance because "the market for IPO shares is not efficient." See In re IPO, 471 F.3d at 42. By contrast, CalPERS has submitted sufficient evidence to establish that class members relied on the efficiency and fairness of the NYSE. See, e.g., Am. Compl. ¶¶ 156, 157, 159, 163, 164, 170. The Specialist Firms, on the other hand, can point to no evidence that investors did not rely on specialists executing their trades on the NYSE in accordance with their obligations under the law.

The Specialist Firms rely heavily on United States v. Finnerty, 474 F. Supp. 2d 530, 540 (S.D.N.Y. 2007), and the district court's grant of a judgment of acquittal, as proof that individual issues will predominate in this case. In fact, the evidence indicates that the opposite is true. In Finnerty, the Honorable Denny Chin found that since the government had failed to present sufficient proof of customer expectations to establish that defendant Finnerty's acts were deceptive under 10(b), the jury's conviction could not stand. See id. at 540. ("Without evidence of what the customers expected, no rational juror could conclude that the interpositioning trades had a tendency to deceive or the power to mislead."). Judge Chin was, however, "clear" that "the Government is not required to call public customers as witnesses to prove their actual expectations. The Government can rely on other evidence, such as documents or other witnesses, to show what customers expected or believed when they dealt with specialists," citing with approval the newspaper articles, press releases, SEC filings, and promotional materials submitted to this Court in the instant case. Id.

Although Finnerty involved proof of customer expectation in the context of deception, the same logic applies to establishing customer expectation in terms of reliance. Indeed, the Court of Appeals acknowledged the applicability of the fraud-on-the-market doctrine to the facts of Finnerty, noting that the "presumption of reliance arises where a civil plaintiff can point to 'public, material misrepresentations' that impugned the integrity of a stock's market price," while upholding the district court's judgment since "the government has attributed to Finnerty nothing that deceived the public or affected the price of any stock: no material misrepresentation, no omission, no breach of a duty to disclose, and no creation of a false appearance of fact by any means." U.S. v. Finnerty, 533 F.3d 143, 151 (2d Cir. 2008) (quoting Basic Inc., 485 U.S. at 248).

This Court has already held, and the government trials reinforce, that CalPERS can establish, on a class-wide basis, that class members relied on an efficient and fair market.

**4. Injury-in-Fact**

Finally, the Specialist Firms argue that CalPERS
cannot prove economic loss without establishing, trade-by-
trade, whether the customer received the price he or she
would have received "but for" the priority violation.
Again relying on Newton, they argue that that proof of
economic injury cannot be made on a class-wide basis.   In
Newton, the Third Circuit held that:

> In fraud-on-the-market cases, the price
> at which a stock is traded is
> presumably affected by the fraudulent
> information, thus injuring every
> investor who trades in the security. .
> .   . Accordingly, presuming economic
> loss was the ineluctable by-product of
> the alleged fraud.  The same does not
> hold true here.   The execution of
> plaintiffs' trades at the NBBO listed
> price did not necessarily injure each
> class member.   Plaintiffs may be
> entitled to a presumption of economic
> loss only when it is clear each class
> member has in fact sustained economic
> injury.

Newton, 259 F.3d at 179–80.  Once it determined that a
presumption of economic loss did not apply, the court went
on to consider the myriad factors that would need to be
considered to determine whether an individual class member
indeed suffered damages.  See id. at 187 (describing
complicated factual inquires required to determine "whether
a particular trade provided an investor with 'the best
reasonably available price'" and listing other terms

relevant to best execution inquiry, including order size,
trading characteristics, speed of execution, clearing
costs, and the cost and difficulty of executing an order in
a particular market). Based on the court's conclusion that
the "factors would appear to vary from class member to
class member and, for each class member, from trade to
trade," the court held that the "Herculean task, involving
hundreds of millions of transactions, counsels against
finding predominance." Id.

        In this case, CalPERS does not ask the Court to
apply any presumption of economic loss to its claims of
market manipulation. Rather, CalPERS has established that
it can prove economic loss through the application of its
algorithm to the NYSE trading data for the Class Period.
CalPERS also claims that it can ascertain, again using the
algorithm, the price an investor would have received "but
for" the Specialist Firms' alleged misconduct. See Corwin
Rebuttal ¶¶ 62–67; compare Newton, 259 F.3d at 188 (denying
certification where plaintiffs' expert merely "projected"
that he could devise a formula to measure damages on a
class-wide basis, rather than providing an actual formula).

While it is true that "[t]he ability to calculate aggregate amount of damages does not absolve plaintiffs from the duty to prove each investor was harmed by the defendants' practice," Newton, 259 F.3d at 189, plaintiffs have convinced this Court that common issues will predominate. "Even if the district court concludes that the issue of injury-in-fact presents individual questions, however, it does not necessarily follow that they predominate over common ones and that class action treatment is therefore unwarranted." Cordes, 502 F.3d at 108.

**Superiority**

Under Rule 23(b)(3), a plaintiff must also demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule lists several factors that are relevant to analyzing whether the class action device is a superior method:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or

> undesirability of concentrating the
> litigation of the claims in the
> particular forum; (D) the likely
> difficulties in managing a class
> action.

Id. This list is "nonexhaustive," Amchem Prods., 521 U.S.

at 615, and "[c]ourts have long recognized that [c]lass

actions are a particularly appropriate and desirable means

to resolve claims based on the securities laws." In re

Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 240

(S.D.N.Y. 2006) (internal quotations and citations

omitted). Accordingly, securities cases "easily satisfy

the superiority requirement of Rule 23." In re Blech Sec.

Litig., 187 F.R.D. 97, 107 (S.D.N.Y. 1999).


        Each of the factors listed above weighs in favor

of class certification. Here, class members have little or

no interest in controlling the prosecution of separate

actions. Indeed, the costs and expenses of such individual

actions would be prohibitive. See Korn v. Franchard Corp.,

456 F.2d 1206, 1214 (2d Cir. 1974) (describing one of chief

goals of Rule 23 as protecting claimants whose "individual

claims would be too small to justify separate litigation").

As for the second and third factors, this case has been

pending since 2003, and since that time, several related

cases have been consolidated before this Court.  Class
certification will also promote economy and uniformity of
decisions by concentrating these consolidated litigations
in a single forum.

Finally, there is no reason to expect any
difficulties in the management of this class action that
would counsel against certification.  The record before the
Court includes prior findings by the SEC and NYSE, and the
evidence presented by CalPERS in support of this motion
suggests that the algorithm developed by the SEC and DOJ
and modified by Lead Plaintiff can be utilized in this case
to identify specific transaction where alleged wrongdoing
occurred on a class-wide basis.  CalPERS has further
demonstrated that it will be able to rely on the database
already developed by the SEC in conjunction with its own
algorithm to ensure that there will be no double recovery
for injured investors who recovered from the SEC's
settlement.

Rather than dispute that these factors weigh in
favor of class certification, the Specialist Firms point to
the SEC investigation, characterizing the instant action as
duplicative of that settlement, and assert that the

extensive time and money already spent administering and distributing settlement funds counsel against class certification.

The Supreme Court has "long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the [SEC]." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007).  Indeed, in this District, numerous securities class actions have been certified despite multi-million dollar settlements resulting from criminal and regulatory investigations.  See, e.g., In re Merrill Lynch & Co. Research Reports Sec. Litig., No. 02 MD 1484 (JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007) (granting class certification following $100 million settlement with New York Attorney General's Office); In re AOL Time Warner, Inc. Sec. & ERISA Litig., No. 02 Civ. 5575 (SWK), 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) (approving class action settlement following defendant's $300 million settlement with the SEC and $150 million settlement with the DOJ); In re WorldCom, 219 F.R.D. 267 (certifying class following partial settlement with the SEC for $2.25 billion, which

was later reduced to $750 million). Further, although the Amended Complaint alleges the same wrongdoing on the part of the Specialist Firms as that alleged in the SEC investigation, the instant suit is not duplicative because, as this Court has already held, it only provides for relief for those violative transactions not yet accounted for. December 2005 Opinion, at 311.

Based on the above, the Court finds that a class action is the superior method for resolving CalPERS' claims and that Lead Plaintiff has satisfied its burden of establishing, by a preponderance of the evidence, that each of the Rule 23 requirements are satisfied in this case. Accordingly, CalPERS' motion for class certification is granted, CalPERS and Market Street are appointed class representatives, and the remaining motions are denied.

It is so ordered.

New York, NY
March /4, 2009

ROBERT W. SWEET
U.S.D.J.